**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

MOHSEN MAHDAWI,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as Acting Boston Field
Office Director; Vermont Sub-Office Director of
Immigration and Customs Enforcement; TODD
M. LYONS, in his official capacity as Acting
Director for U.S. Immigration and Customs
Enforcement; KRISTI NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; MARCO
RUBIO, in his official capacity as Secretary of
State; and PAMELA BONDI, in her official
capacity as Attorney General of the United States,

*Respondents*.

Case No. 2:25-cv-00389

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
RELEASE UNDER *MAPP v.
RENO***

**ORAL ARGUMENT
REQUESTED**

## <u>MOTION FOR RELEASE UNDER *MAPP v. RENO*</u>

Petitioner Mohsen Mahdawi respectfully moves for immediate release pursuant to this
Court's inherent authority, detailed in the accompanying memorandum and exhibits. Mr.
Mahdawi—a lawful permanent resident—has been imprisoned solely for engaging in protected
speech. His continued detention is unconstitutional, inflicts irreparable harm, and chills free
expression; prompt release is necessary to ensure meaningful habeas review and uphold core
constitutional rights.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTS ...................................................................................................................... 1

I.   ICE detained Mr. Mahdawi in retaliation for his speech advocating for Palestinian human rights ................................................................................ 1

II.  Mr. Mahdawi's arrest and detention are part of a policy intended to silence and chill the speech of those who advocate for Palestinian human rights ........................................... 5

III. Mr. Mahdawi is a long-time lawful permanent resident and a beloved member of the communities he has lived and studied in. ....................................... 7

IV. This Court has authority to grant Mr. Mahdawi immediate release pending the adjudication of this habeas petition. .......................................... 9

ARGUMENT .......................................................................................................... 9

I. Mr. Mahdawi satisfies the requirements for release under *Mapp* ............................... 10

   A. Mr. Mahdawi raises substantial claims for habeas relief. ................................ 10

      1. First Amendment. ............................................................................ 10

      2. Due Process. .................................................................................... 12

      3. APA and *Accardi* Doctrine ............................................................. 13

   B. The chilling of First Amendment protected speech is an extraordinary circumstance ................................................................................. 14

   C. That Mr. Mahdawi is not a flight risk or danger to the community further bolsters that these are extraordinary circumstances. ................................. 16

   D. These extraordinary circumstances make the grant of bail necessary to make the habeas remedy effective. ...................................................... 17

   E. No INA Provision Bars this Court from Ordering Mr. Mahdawi's Release. ... 18

CONCLUSION .................................................................................................... 22

i

## TABLE OF AUTHORITIES

**Cases**

*Aguilar v. U.S. Imm.& Customs Enforcement Div. of Dep't of Homeland Sec'y*, 510 F.3d 1 (1st Cir. 2007)..................................................................................................................20

*Arias v. Decker*, 459 F. Supp. 3d 561 (S.D.N.Y. 2020)....................................................18

*Avendaño Hernandez v. Decker*, 450 F. Supp. 3d 443 (S.D.N.Y. 2020) .......................9, 10

*Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021)....................................................11, 12

*Black v. Decker*, 103 F.4th 133 (2d Cir. 2024) ...................................................................12

*Boumediene v. Bush*, 553 U.S. 723 (2008)...........................................................................22

*City of Houston, Tex. v. Hill,* 482 U.S. 451 (1987) .............................................................12

*Connick v. Myers*, 461 U.S. 138 (1983) ...............................................................................10

*Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................................10

*D'Alessandro v. Mukasey*, No. 08- CV-914, 2009 WL 799957 (W.D.N.Y. Mar. 25, 2009)...9, 14, 16

*Demore v. Kim*, 538 U.S. 510 (2003).............................................................................13, 19

*E.O.H.C. v. Secretary U.S. Dep't of Homeland Sec'y*, 950 F.3d 177 (3d Cir. 2020) .......................20

*Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151 (2d Cir. 2007)........................................9

*German Santos v. Warden Pike Cnty. Corr. Facility*, 96 5 F.3d 203 (3d Cir. 2020).......................13

*Kiadii v. Decker*, 423 F. Supp. 3d 18 (S.D.N.Y. 2018)...................................................9, 14

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001).......................................................1, 9, 18, 22

*Matal v. Tam*, 582 U.S. 218 (2017)......................................................................................11

*Ozturk v. Trump*, 2:25-cv-00374-wks (D.Vt. April 18, 2025), Doc. # 104,  slip op at 29-32............19

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ....................................................................11

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999)..............................21

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...........................11

*S.N.C. v. Sessions*, No. 18 Civ. 7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018)......................9

*Smith v. Campbell*, 782 F.3d 93 (2d Cir. 2015) .................................................................11

*Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) ...................................................................19

**Statutes**

5 U.S.C. § 706(2)(A)-(C) .......................................................................................................13

8 U.S.C. § 1182(a)(3)(C)(iii) ....................................................................................................4

8 U.S.C. § 1226(e) ....................................................................................................................19

8 U.S.C. § 1252(g) ....................................................................................................................20

## INTRODUCTION

On April 14, 2025, Petitioner Mohsen Mahdawi—a lawful permanent resident for 10 years—was forcefully detained by masked agents after his naturalization interview solely on the basis of his speech. Evidence provided by the government establishes that his incarceration is based on nothing else. The Supreme Court has held that "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1988)). Mr. Mahdawi has been imprisoned for one week as a result of his speech, and the government's retaliatory conduct has led to a chill in the speech of others.

This Court has the power, pursuant to its inherent authority, to release Mr. Mahdawi pending the adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). The authority to release a habeas petitioner *pendente lite* ensures that the writ of habeas corpus remains an effective remedy under extraordinary circumstances. *Id.* at 230. And extraordinary circumstances have defined every aspect of Mr. Mahdawi's case—from his apprehension after his naturalization interview, to his detention for his constitutionally- protected speech. Moreover, Mr. Mahdawi is not a flight risk or danger to the community—rather, Mr. Mahdawi has deep community ties, a long history of being actively invested in the peace process, and nearly 80 individuals who can attest to his character. (Droubi Decl. Exs. 1-A–1-CA.**)** This Court should grant Mr. Mahdawi's immediate release.

## FACTS

### I.     ICE detained Mr. Mahdawi in retaliation for his speech advocating for Palestinian human rights

Mr. Mahdawi was born and raised in Al-Fara'a refugee camp in the West Bank. (Mahdawi Decl. ¶4). There, he witnessed the deaths of friends, relatives, and community members due to Israeli

military violence. (*Id*. ¶ 4). At age 15, he was shot in the left leg by an Israeli soldier. (*Id*. ¶ 4.) He immigrated to the U.S. and transferred to Columbia University in 2021. (Id. ¶7.) Throughout his time at Columbia University, Mr. Mahdawi exercised his advocacy in different forms: public speeches, community engagement with people who held differing beliefs, and storytelling initiatives. (Mahdawi Del. ¶ 15; Droubi Decl. Exs. 1-A–1-CA.) Following Israel's military campaign in Gaza, which began in fall of 2023, Mr. Mahdawi felt compelled to speak up in support of the Palestinian people, in opposition to all forms of violence and war. (Mahdawi Decl. ¶¶ 4, 15.) Mr. Mahdawi attended protests opposing Israel's military campaign in Gaza and supporting Palestinian human rights. Id. He gave speeches at several of these protests. Id. In these speeches, Mr. Mahdawi advocated for respect for international law, a permanent ceasefire, and a peaceful resolution that affirmed the human dignity of all. Id. In February of 2024, Mr. Mahdawi applied for U.S. citizenship. (Mahdawi Decl. ¶ 6.)

Following the election of President Trump in November of 2024, individuals and groups that opposed human rights for Palestinians began to publicly demand that ICE detain Mr. Mahdawi for his speech on Palestinian rights and his involvement in advocacy efforts at Columbia. (*See, e.g.*, Petition ¶¶ 41, 49.) Many of these same groups targeted Mahmoud Khalil, another Palestinian lawful permanent resident, in the months leading up to Mr. Khalil's arrest and detainment by ICE. Id. at 40. Mr. Mahdawi was fearful of what appeared to be the Trump Administration's willingness to target and detain individuals on the basis of their speech. On January 30, 2025, one group posted on X that "Mohsen Mahdawi is on our deport list." In the weeks between Mr. Khalil's arrest and his own, Mr. Mahdawi stayed inside and said little publicly. (Mahdawi Decl. ¶ 21.) In a press conference on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kind of anti-Jewish, anti-semitic activities, and "if you end up having a green card . . . we're going to kick

you out." Mr. Mahadawi  understood these comments to be a statement of intent by the Administration to target people speaking out for Palestinian rights (Mahdawi Decl. ¶¶ 21.)  Two days later, the same group posted that Mr. Mahdawi was "next and also on the deport list."  He felt physically unsafe walking around New York. His speech had been effectively chilled and his physical safety compromised. (Mahdawi Decl. ¶ 21.)

On March 27, 2025 Mr. Mahdawi was notified by the United States Citizenship and Immigration Services ("USCIS") that his naturalization interview had been scheduled for April 14, 2025 in Colchester, Vermont. (Mahdawi Decl. ¶ 22.) This interview marked the final stage in Mr. Mahdawi's naturalization process, after ten years of living in the United States as a lawful permanent resident. (Mahdawi Decl. ¶ 23.) During those ten years, Mr. Mahdawi always complied with the conditions of his status. (Mahdawi Decl. ¶ 24.) This instance was no different. *Id.* Though he was concerned it might be a trap, Mr. Mahdawi appeared promptly in Vermont to complete his naturalization interview. (*Id.*  ¶¶ 24-25.)

On April 14, 2025, Mr. Mahdawi attended the interview. (*Id.* ¶ 25.) He raised his right hand, answered all the questions that were asked of him truthfully, and signed a document that he was willing to "defend the Constitution and laws of the United States of America against all enemies, foreign, and domestic." (Mahdawi Decl. ¶¶ 27, 29.)

It was a trap.  At approximately 12:00 P.M., the USCIS official informed Mr. Mahadawi that he needed to "check" on some information and would be right back. ICE agents, masked and visibly armed, entered the interview room and shackled Mr. Mahdawi. (Mahdawi Decl. ¶¶ 30-33.) He was separated from his immigration attorney, placed into a car, and the government immediately initiated the process of transferring him across state lines, over a thousand miles away, to Louisiana. (*Id.* ¶¶ 34-38.) Despite the government's attempts at a rapid transfer, at approximately 3:11 P.M., the Honorable Judge William K. Sessions III granted an Emergency Motion for a Temporary Restraining

Order enjoining the transfer or removal of Mr. Mahdawi from the District of Vermont or from the United States. *See* ECF No. 6. At approximately 5:57 P.M., the automated case information system for the Executive Office for Immigration Review still listed the venue of Mr. Mahdawi's Master Calendar Hearing to be in Louisiana under Judge Sherron Ashworth. (Droubi Decl. Ex. 1-CC.)

At the time of this motion, Mr. Mahdawi is being detained in the Northwest State Correctional Facility in St. Albans, Vermont, although the venue of his immigration proceeding is still listed as Louisiana in the Executive Office for Immigration Review Case Portal, which shows Mr. Mahdawi's next hearing date as being in Louisiana on May 1, 2025. (Isaacson Decl., Ex. 1.) The Notice to Appear served on Mr. Mahdawi by DHS charges that he is removable from the United States under section 237(a)(4)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(4)(C), because, it alleges, "The Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." (Mahdawi Decl., Ex. 1., ¶¶ 1, 4.)

The phrase "compelling U.S. foreign policy interest" comes from a related provision, 8 U.S.C. § 1882(a)(3)(C)(iii), which requires the Secretary of State to make such a "determination" when Mr. Mahdawi's "beliefs, statements, or associations" would otherwise be "lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii), cited in 8 U.S.C. § 1227(a)(4)(C)(ii). Form I-213, which DHS attached to the version of the Notice to Appear filed in the proceedings, confirms this "determination," stating in relevant part that "[t]he determinations [made by the Secretary of State] are based on information provided by DHS/ICE/HSI that MAHDAWI, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction." (Isaacson Decl., Ex. 2, at 9; Form I-213 at 2.) Notwithstanding the falsehoods in these baseless allegations, these documents (1) constitute the only evidence presented by the government for his detainment, and (2) make clear

4

that the basis for Mr. Mahdawi's detention is his "lawful" speech and associations.

We ask this Court to suspend this unlawful retaliation and slow the grave threat to free speech posed by his continued detainment by releasing Mr. Mahdawi on bail.

## II.    Mr. Mahdawi's arrest and detention are part of a policy intended to silence and chill the speech of those who advocate for Palestinian human rights.

Mr. Mahdawi's arrest, transport, and detention are part of an effort by the Trump Administration to silence and chill speech supportive of the rights of Palestinians and critical of Israel's war in Gaza, especially on university campuses. Opponents of such speech, including President Trump, have mischaracterized it as inherently supportive of Hamas or antisemitic. On the campaign trail, President Trump promised to "terminate the visas of all those Hamas sympathizers and . . . get them the hell out of our country," and stated that foreign students would "behave" because "any student that protests, I throw them out of the country." (Petition ¶ 32.)

In January 2025, President Trump signed two Executive Orders to begin to fulfill his campaign promise of freezing speech in support of Palestinians. First, Executive Order 14161 declares the need to "ensure" that noncitizens in the United States "do not . . . advocate for, aid, or support designated foreign terrorists and other threats to our national security."[1] The Second Executive Order was published alongside a fact sheet, wherein White House promised "[i]mmediate action" to "investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities."[2] The sheet "promises" to noncitizens "who joined in the pro-jihadist protests" that the government "will find you, and . . . deport you."[3] The President further promised to "quickly cancel

---

[1] Presidential Actions: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-united-states-from-foreign-terrorists-and-othernational-security-and-public-safety-threats/.

[2] Fact Sheet: *President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, THE WHITE HOUSE (Jan. 30, 2025), https://www.whitehouse.gov/fact- sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[3] *Id.*

the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[4]

In early March 2025, the Trump Administration began targeting students who had spoken in support of Palestinians for visa revocation, removal, and arrest and detention. On March 7, DHS agents attempted to arrest a Columbia doctoral student Ranjani Srinivasan who had posted on social media and signed open letters related to Israel's war in Gaza. DHS released a statement characterizing her as being "involved in activities supporting Hamas."[5] In the ensuing days and weeks, ICE arrested Mahmoud Khalil, Rumeysa Öztürk, and Dr. Badar Khan Suri, and promptly sent all three to Louisiana detention facilities. The government also sought unsuccessfully to detain Yunseo Chung and Momodou Taal. A court temporarily prohibited Ms. Chung's detention[6] and Mr. Taal decided to depart the United States after being denied the same protection.[7]

By targeting Mr. Mahdawi in this draconian manner, the government has sent a chilling message nationwide: lawful permanent residents who exercise their right to free expression risk detention and deportation if their views diverge from those of the current administration.

Mr. Mahdawi was targeted for arrest, detention, transfer, and attempted deportation pursuant to the Trump administration's policy of targeting students for any speech about Palestine. After Mr. Mahdawi's arrest, the *New York Times* published portions of an unreleased memorandum by Secretary of State Marco Rubio ("the Rubio Memorandum"), that states that Mr. Mahdawi had been detained because the protests of the type that Mr. Mahdawi has been involved in could allegedly

---

[4] *Id.*

[5] VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport, DEP'T OF HOMELAND SEC. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa- was-revoked-supporting-hamas-and.

[6] Patrick Smith and Doha Madani, *Judge rules Columbia protester Yunseo Chung can't be detained as she fights deportation*, March 25, 2025, https://www.nbcnews.com/news/us-news/columbia-protester-yunseo-chung-sues-trump-administration-prevent-depo-rcna197927.

[7] Gloria Pazmino & Amanda Musa, Cornell student activist chooses to leave US after judge denies bid to immediately block deportation (Apr. 2, 2025), https://www.cnn.com/2025/03/31/us/cornell-student-activist-deportation/index.html.

undermine the Middle East peace process.[8] The Rubio Memorandum also asserted, without elaborating, that Mr. Mahdawi had "engaged in threatening rhetoric and intimidation of pro-Israeli bystanders," and that his actions had undermined efforts to protect Jewish students from violence.[9] In fact, the language "threatening rhetoric and intimidation" appears to come directly from a statement issued by Columbia University about the student protests, which was later retracted. (Droubi Decl. E.. 1-V.)  The government has yet to produce any evidence beyond its *ipse dixit* for these claims, which contradict Mr. Mahdawi's long and documented commitment to peaceful advocacy and to combating antisemitism. Clearly, the Defendants' claims are a façade to target clearly protected speech related to Palestinian human rights.

### III.    Mr. Mahdawi is a long-time lawful permanent resident and a beloved member of the communities he has lived and studied in.

Mr. Mahdawi has earned deep respect as a pillar of his Vermont and Columbia University communities, a top student, a trusted friend, a dedicated Buddhist, and a committed peacemaker. Ninety declarations attest to his character and contributions. (Droubi Decl. Exs. 1-A–1-CA.) He is set to graduate from Columbia University in May 2025, just one month after this motion. (Mahdawi Decl. ¶7-8.) Following his graduation, Mr. Mahdawi intends to return to Columbia University in the fall of 2025 to pursue a Master's at the School of International and Public Affairs ("SIPA") to study international conflict resolution and peacebuilding. (Mahdawi Decl.  ¶ 10; Droubi Decl. Ex. 1-CB.)

While living in Vermont, Mr. Mahdawi frequently invited his neighbors and others over for dinner, led outdoor hikes, and helped neighbors dig cars out from the snow. (Droubi Decl. Ex. 1-BX; 1-CA.) He was a member of the First Unitarian Church or Hartland Services where he sought unity and helped bridge political divides. (Droubi Decl. Exs. 1-BF; 1-BY; 1-BW.) In his community in

---

[8] Hamed Aleaziz and Jonah E. Bromwich, *U.S. Cites Mideast Peace Process to Justify Move to Deport Student,* New York Times (April 15, 2025), https://www.nytimes.com/2025/04/15/nyregion/rubio-mahdawi-deportation-letter.html.
[9] *Id.*

Vermont, he is known to "espouse[] and practice[] peace and co-existence." (Droubi Decl. Ex. 1-BV.)

As a student at Columbia University, Mr. Mahdawi served as the President of the Columbia Buddhist Association and co-founded the Palestinian Student Union ("Dar"). (Petition ¶ 25.) He spent his years at Columbia University working to create dialogues "to spread a call for a non-violent sustainable plan, . . . drafted jointly by Palestinians and Israelis." (Droubi Decl. Ex. 1-N.) He made students, including those in the Jewish and Zionist communities at the University "fe[el] entirely safe and respected". (Droubi Decl. Exs. 1-K; 1-L; 1-T.) He "eased tensions on campus, not increased them", and "striv[ed] for reconciliation and peace". (Droubi Decl. Exs. 1-K; 1-P; 1-Q.)

In fact, University colleagues write, Mr. Mahdawi's "consideration for the individual humanity of others is unwavering" (Droubi Decl. Ex. 1-AF.). He is a "a bridge-builder and a man of peace." (Droubi Decl. Ex. 1-BE.) Numerous professors at Columbia note his focus on "peaceful change" (Droubi Decl. Ex. 1-AA.). After taking a Peace Making and Negotiations course at Columbia, Mr. Mahdawi worked with an Israeli student and their professor to organize a 4-to-5-day seminar retreat in the summer of 2024. (Droubi Decl. Ex. 1-W.) As an academic, Mr. Mahdawi is a "sophisticated thinker and theorist who sought to bring the academic tools he was acquiring in the classroom to bear on one of the most vexing contemporary political problems of his generation and mine: the Israeli-Palestinian conflict." (Droubi Decl. Ex. 1-V.)

Mr. Mahdawi "believes that overcoming injustice requires a deep commitment not only to non-violence, but to a holistic and transformative movement, rooted in loving kindness, that cares for the others' well-being." (Droubi Decl. Ex. 1-BI.) "Mohsen's respect for others, including Jewish students, [is] unmistakable." (Droubi Decl. Ex. 1-U.) "Of all the people I have had the pleasure of meeting, no one else inspires me so deeply. No one else commands so much of my admiration and my respect. No one else is as worthy of calling this land their home." (Droubi Decl. Ex. 1-L.)

8

As a Buddhist, Mr. Mahdawi believes in the "need to collectively come together as a global community with peace as the ultimate mission." (Droubi Decl. Ex. 1-D.) Mr. Mahdawi "took these precepts and values to heart," practicing meditation "to transmute anger into patience and hatred into forgiveness and love." (Droubi Decl. Ex. 1-F.) Mr. Mahdawi was known in the Buddhist community as "a dedicated and gifted community leader devoted to Buddhist values of mutual respect and understanding." (Droubi Decl Ex. 1-E.)

## ARGUMENT

**I.    This Court has authority to grant Mr. Mahdawi immediate release pending the adjudication of this habeas petition.**

This Court should release Mr. Mahdawi on personal recognizance, or alternatively on bail, pending adjudication of his petition pursuant to the Court's inherent habeas authority. *See Mapp*, 241 F.3d at 231; *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007).

Numerous courts within this circuit have already ordered release pursuant to *Mapp* in contexts involving challenges to detention, removal, or a combination of both. *See, e.g.*, *Avendaño Hernandez v. Decker*, 450 F. Supp. 3d 443 (S.D.N.Y. 2020); *D'Alessandro v. Mukasey*, No. 08- CV-914, 2009 WL 799957 (W.D.N.Y. Mar. 25, 2009); *S.N.C. v. Sessions*, No. 18 Civ. 7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018); *Kiadii v. Decker*, 423 F. Supp. 3d 18 (S.D.N.Y. 2018). This Court should do the same.

Under *Mapp*, "a court considering a habeas petitioner's fitness for bail" must analyze (1) whether the habeas petition raises "substantial claims" and (2) whether "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." 241 F.3d at 230 (cleaned up). To raise a substantial claim, "the Second Circuit does not require that the petitioner convince every court, let alone the court considering the bail application, that he *will* succeed; rather, he need only show that his claims are 'substantial.'" *D'Alessandro*, 2009 WL 799957, at *3 (emphasis in original). This standard is largely akin to demonstrating a "likelihood of

9

success." *See e.g.*, *id.* at *3; *Kiadii,* 423 F. Supp. 3d at 20. At the same time, a broad range of circumstances may qualify as "extraordinary," including lack of flight risk or dangerousness, health issues, and the nature of the government behavior giving rise to the habeas claim. *See, e.g.*, *Coronel v. Decker*, 449 F. Supp. 3d 274, 289 (S.D.N.Y. 2020); *D'Alessandro*, 2009 WL 799957, at *3. Where, as here, the petitioner would face "the very outcome they seek to avoid" if they remained in detention pending determination of the merits, release is necessary to make the habeas remedy effective. *See Coronel*, 449 F. Supp. 3d at 289.

**II.    Mr. Mahdawi satisfies the requirements for release under Mapp.**

This Court should grant Mr. Mahdawi's motion for release on recognizance, or alternatively grant his release on bail. Mr. Mahdawi is, by the government's own admission, being held on the basis of his lawful speech. *See Avendaño Hernandez*, 450 F. Supp. 3d at 447. Each day Mr. Mahdawi remains in detention harms his education, hurts his community, stifles his speech, and rewards the government for its unconstitutional attempt to punish and chill those who speak about Palestinian human rights. Releasing Mr. Mahdawi pending final adjudication of his petition is necessary to preserve the effectiveness of the habeas remedy.

**A.  Mr. Mahdawi raises substantial claims for habeas relief.**

Through his habeas corpus petition, Mr. Mahdawi seeks to protect his rights under the First Amendment, the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, and the *Accardi* doctrine.

1.   *First Amendment.*    Mr. Mahdawi's substantial claim that he was arrested after his naturalization interview and detained because of views he expressed implicates the heart of the First Amendment.

Speech on "public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal

10

quotation marks omitted). Because "[i]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys," viewpoint discrimination is "an egregious form of content discrimination, which is presumptively unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part) (cleaned up); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Mr. Mahdawi's arrest and detention violate these core First Amendment principles as unconstitutional retaliation based on his protected speech. To succeed on his First Amendment retaliation claim, Mr. Mahdawi must show that: "(1) [he] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the petitioner's] exercise of that right, [and] (3) the defendant's actions caused [the petitioner] some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (cleaned up); *see also Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) ("A plaintiff making a First Amendment retaliation claim must allege that (1) [s]he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.") (internal quotation marks omitted). Mr. Mahdawi easily satisfies this standard.

First, noncitizen speakers are protected by the First Amendment. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded aliens residing in this country.") This protection readily applies to Mr. Mahdawi's speech and advocacy in support of Palestinian human rights. The speech of a noncitizen on an issue central to "current political debate among American citizens and other residents" lies "'at the heart of First Amendment protection' and 'occupies the highest rung of the hierarchy of First Amendment values.'" *Ragbir*

*v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (quoting *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011)), *cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020)). Courts in this and other circuits have made clear that the First Amendment protects noncitizens who are detained and threatened with deportation because of their protected speech. *See, e.g., id.*; *Bello-Reyes*, 985 F.3d at 698; *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018).

Second, there is no question that Mr. Mahdawi's speech was a substantial factor in the government's decision to arrest and detain him—indeed, the only justification that the government has provided since his arrest relates to his association with protests in support of Palestinian human rights and his "rhetoric."[10] "To allow this retaliatory conduct to proceed would broadly chill protected speech" of other noncitizens engaged in pro-Palestinian advocacy, extending the unconstitutional impact of Mr. Mahdawi's arrest and detention. *Ragbir*, 923 F.3d at 71.

Finally, the government's actions did injure, and continue to injure, Mr. Mahdawi. Indeed, few government actions could be more chilling on speech than a federal agency choosing to abruptly arrest and jail a person who had just finished the final stage of his naturalization process, who is a mere month away from graduating from college. *Cf. City of Houston, Tex. v. Hill,* 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Both the fact and the nature of Mr. Mahdawi's arrest and detention are jarring, as the public outcry in response to the situation makes clear.

2.    *Due Process.*    Mr. Mahdawi's due process claims are also substantial. The Constitution

---

[10] Hamed Aleaziz and Jonah E. Bromwich, *U.S. Cites Mideast Peace Process to Justify Move to Deport Student,* New York Times (April 15, 2025), https://www.nytimes.com/2025/04/15/nyregion/rubio-mahdawi-deportation-letter.html.

establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Immigration detention is civil, not criminal, and thus only justified when necessary to ensure a noncitizen's appearance during removal proceedings and to prevent danger to the community. *See Black*, 103 F.4th at 143 (citing *Zadvydas*).

The government's detention of Mr. Mahdawi is wholly unjustified, as the government has not demonstrated that Mr. Mahdawi—a well-loved member of the communities that he belongs to and a man with no criminal record—is either a flight risk or a danger. *Cf. Zadvydas*, 533 U.S. at 690; Droubi Decl. Exs. 1-A–1-CA. Rather, Mr. Mahdawi's detention bears no "reasonable relation" to any nonpunitive government purpose. *See Zadvydas*, 533 U.S. at 690. Here, there is every indication that Mr. Mahdawi's "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons," which violates the due process clause. *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring); *see also German Santos v. Warden Pike Cnty. Corr. Facility*, 96 5 F.3d 203, 211 (3d Cir. 2020) ("[I]f an alien's civil detention . . . looks penal, that tilts the scales toward finding the detention unreasonable.").

3. *APA and* Accardi *Doctrine.* Finally, Mr. Mahdawi's APA and *Accardi* claims regarding his arrest and detention are substantial. The government has adopted an unconstitutional and unlawful policy of targeting noncitizen students for arrest, transport, and detention based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. *See* 5 U.S.C. § 706(2)(A)-(C). Moreover, the government's actions present a classic violation of the

13

*Accardi* doctrine, as the government is violating its regular processes and rules, including those pertaining to First Amendment activity, in order to detain and deport Mr. Mahdawi. *Cf. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) (agency may not violate its own rules and processes simply because Attorney General singled him out for deportation); *see also, e.g.*, DHS, Memorandum of Kevin McAleenan (May 17, 2019) (stating DHS "does not profile, target, or discriminate against any individual for exercising his or her First Amendment Rights").[11]

## B. The chilling of First Amendment protected speech is an extraordinary circumstance.

That Mr. Mahdawi was apprehended solely on the basis of his speech is an extraordinary circumstance warranting his immediate release. Courts look at the scope of the constitutional deprivation that a petitioner has experienced and the nature of the government's behavior surrounding a petitioner's detention to support a finding of extraordinary circumstances. *See, e.g.*, *D'Alessandro*, 2009 WL 799957, at \*3 (listing "grossly defective" immigration custody reviews and petitioners unconstitutionally prolonged detention as two circumstances that qualified the case as extraordinary and exceptional). Mr. Mahdawi's case is extraordinary in every respect: he was detained during his naturalization interview, targeted solely for his protected speech, incarcerated for his speech, and faces additional irreparable harm to his education and liberty. *See, e.g.*, *Kiaddii*, 423 F. Supp. 3d at 20-21  ("Indeed, the Court wonders if the Mapp court could have imagined circumstances more extraordinary than the detention of a woman credibly claiming United States citizenship by none other than  the immigration authorities. The Government's arguments that the habeas petition does not present an 'extraordinary circumstance' or support it with evidence is so mystifying that it practically shocks the conscience.")

And here, the government's motivations for Mr. Mahdawi's arrest and detention, and the

---

[11] *Available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protecte d_activities_as1_signed_05.17.2019.pdf.

way in which they implemented these actions, constitute extraordinary circumstances. With respect to the former, as described *supra*, the government targeted Mr. Mahdawi, a lawful permanent resident, solely because of his speech. No other justification has been offered besides Mr. Mahdawi's lawful expression relating to his beliefs. And as discussed *supra*, this justification plainly violates the First Amendment.

The manner in which the government effectuated Mr. Mahdawi's arrest and detention further underscores the existence of extraordinary circumstances justifying his release. The government's conduct in this case has been highly unusual, to put it mildly. *See, e.g.,* Heather Yountz Decl., Pl's Motion for Release, *Ozturk v. Trump*, No. 2:25-cv-00374, ECF No. 82, Ex. 4 ("In my 17 years of immigration practice . . . [t]he fastest transfer I recall seeing was 24 hours after initial placement."). Mr. Mahdawi was arrested at the end of his naturalization interview, with masked and armed ICE agents entering the room and rushing him into a black van and to the airport with a clear plan to ship him to Louisiana. (Mahdawi Decl. ¶¶ 29-39; Droubi Decl. at Ex. 1-CC.) In addition to chilling speech protected by the First Amendment, the government's actions also have the potential to prevent individuals from seeking naturalization. Non-citizens may view status check-ins or interviews with immigration officials as opportunities for them to be detained or arrested for their speech. Lawful permanent residents may opt not to seek naturalization at all for fear of landing in detention as retaliation for their speech or protest activity.

The government's attempts to rapidly transfer Mr. Mahdawi to Louisiana following his arrest heightened the extraordinary circumstances. *See, e.g.,* Jill Martin Diaz Decl., Pl's Motion for Release, *Ozturk v. Trump*, No. 2:25-cv-00374, ECF No. 82, Ex. 6 ("It is extraordinary for a Vermont detainee to be transferred from custody in the northeast to custody outside of the northeast."). In fact, the venue of Mr. Mahdawi's immigration proceeding has always been listed as Louisiana, demonstrating a prior intent to detain Mr. Mahdawi there. (Droubi Decl. Ex. 1-CC.) Had this Court

not issued a TRO enjoining his transfer, Mr. Mahdawi would likely now be detained in Louisiana, over a thousand miles away from his community and legal team. Indeed, the government followed this pattern in the arrests of students Mahmoud Khalil, Dr. Badar Khan Suri, Leqaa Kordia, and Rumeysa Öztürk: targeting them for their protected speech, ambushing them without notice, and rushing them to Louisiana to be detained far from home.

### C. That Mr. Mahdawi is not a flight risk or danger to the community further bolsters that these are extraordinary circumstances.

Courts consider a lack of evidence that a petitioner is a flight risk or a danger to the community to establish extraordinary circumstances. *See, e.g.*, *D'Alessandro*, 2009 WL 799957, at *3. In this case, "there is no evidence whatsoever" that Mr. Mahdawi poses such risks. *Id.* Rather, all evidence demonstrates Mr. Mahdawi's deep ties to his academic and social community and is an asset to his communities rather than a danger.

Vermont is Mr. Mahdawi's physical home, and Columbia University is Mr. Mahdawi's intellectual home. He poses no flight risk. Mr. Mahdawi is a month away from receiving his undergraduate degree at Columbia University. (Mahdawi Decl. ¶47.). He plans to begin a master's program at Columbia in fall of 2025. *Id.* ¶49. Declarant after declarant has sworn to Mr. Mahdawi's deep connectivity to the Columbia University campus and surrounding areas in the East Coast. (Droubi Decl. Exs. 1-A–1-CA.) Indeed, Mr. Mahdawi maintains a permanent residence in White River Junction, Vermont, which he shares with a roommate. (Mahdawi Decl. ¶ 2; Droubi Decl. Ex. 62.) In a statement published following Mr. Mahdawi's arrest, the city council of Hartford, Vermont affirmed that Mr. Mahdawi is "a neighbor, and a friend to many. He has added value as an educator, mediator, and relationship builder, and has an outpouring of support from his home of Hartford."[12]

Beyond Vermont and the Columbia campus, Mr. Mahdawi has no other home. He has spent

---

[12] https://www.hartford-vt.org/CivicAlerts.aspx?AID=815.

the last ten years building a life here in the United States. (Mahdawi Decl. ¶ 45.) Mr. Mahdawi has already demonstrated a history of compliance with immigration proceedings. (*Id.* ¶ 24.) He voluntarily appeared at his naturalization interview in Vermont, despite knowing that groups opposed to Palestinian rights had been targeting him and reporting his name to authorities. (Petition ¶¶ 41, 49.) Mr. Mahdawi is a cherished member of his community, not a danger to it. He has no criminal record, has demonstrated at every turn a commitment to peaceful advocacy, and has fostered friendships with individuals from all walks of life. (Droubi Decl. Ex. 1-J.) He has spoken up against antisemitism just as he has spoken up in support of Palestinian human rights. (Droubi Decl. Exs. 1-V; 1-K; 1-P; 1-Q.). His belief in the preciousness of human life extends to all people, regardless of their race, religion, national origin, or ethnicity, as numerous people have attested to. (Droubi Decl. Exs. 1-AQ; 1-F; 1-B.)

In sum, from start to finish, the circumstances of Mr. Mahdawi's case have been extraordinary and merit his release.

### D. These extraordinary circumstances make the grant of bail necessary to make the habeas remedy effective.

In light of what is described above, release pending the litigation of Mr. Mahdawi's petition is necessary to secure him an effective habeas remedy.

Mr. Mahdawi's challenge to the constitutionality of the government's decision to arrest and detain him is a significant part of the First Amendment injury at the center of this litigation. Even if Mr. Mahdawi is ultimately released at the conclusion of what could be protracted litigation, he will have been prevented from speaking freely all the while and the message to others will be received loud and clear: speak at your own peril. Allowing Mr. Mahdawi to remain in detention would ratify the chilling effect that the government intends to create. *Cf. Arias v. Decker*, 459 F. Supp. 3d 561, 580 (S.D.N.Y. 2020) (granting bail to avoid "precisely the harm their petition seeks to avert"). This is different from *Mapp*, where bail was ultimately denied because "[t]he relief

sought by petitioner" did not "guarantee[] . . . his release from detention" but only involved allowing him to apply for a particular waiver of deportation, and "the effectiveness of this form of relief [wa]s wholly independent of the question of whether Mapp [wa]s incarcerated while the [waiver] hearing [wa]s pending." *Mapp*, 241 F.3d at 230-231. Here, relief from the chilling effect on speech is indeed dependent on whether Mr. Mahdawi remains incarcerated. "The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Release is also necessary to avoid what is a devastating punitive consequence of Mr. Mahdawi's continued detention, namely, the disruption of his education. Mr. Mahdawi is expected to graduate from Columbia University in May of 2025, but his graduation is contingent on the completion of two classes that he is currently enrolled in. (Droubi Decl., Ex. 1-CB.) Every day that Mr. Mahdawi spends in captivity is a day that he is prevented from working towards his degree. And if he is prevented from graduating from his bachelor's degree program, he will also be prevented from beginning his master's degree at Columbia SIPA this coming fall. (Droubi Decl. Ex. 1-CB.)

### E.  No INA Provision Bars this Court from Ordering Mr. Mahdawi's Release

The INA[13] does not bar this Court from releasing Mr. Mahdawi, and could not do so without violating the Suspension Clause of the U.S. Constitution. At the very least, Mr. Mahdawi is sufficiently likely to prevail on the jurisdictional question that interim release is appropriate under *Mapp*.

To start, 8 U.S.C. § 1226(e) does not deprive this Court of jurisdiction to order Mr. Mahdawi's release. That section provides that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any

---

[13] Immigration and Nationality Act of 1952, 8 U.S.C. Ch. 12 (INA).

action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). The Court of Appeals for the Second Circuit has made clear, however, that this provision does not "limit habeas jurisdiction over constitutional claims or questions of law." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). Indeed, "Section 1226(e) contains no explicit provision barring habeas review" at all. *Demore v. Kim*, 538 U.S. 510, 517 (2003). This petition and this motion do not ask for review of a discretionary determination, but rather for habeas review of Mr. Mahdawi's unconstitutional detention and other constitutional claims and questions of law. Thus, under *Demore* and *Velasco Lopez*, § 1226(e) does not strip this Court of jurisdiction. Another judge of this Court recently so held with regard to a similar habeas petition filed by nonimmigrant student Rumeya Ozturk. *See Ozturk v. Trump*, 2:25-cv-00374-wks (D.Vt. April 18, 2025), Doc. # 104, slip op at 29-32.

Nor does 8 U.S.C. § 1252(a)(5), which provides that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter," 8 U.S.C. § 1252(a)(5), and which (unlike § 1226(e)) specifically precludes habeas review, have any bearing here. Mr. Mahdawi has not been ordered removed, and he does not seek review of any order of removal. As the District Court in *Ozturk* explained just days ago, 1252(a)(5) does not apply under these circumstances. *See Ozturk*, Doc. # 104, slip op. at 35-37.

For similar reasons, 8 U.S.C. § 1252(b)(9), though it also addresses habeas review, does not bar this action nor Mr. Mahdawi's interim release on recognizance or bail when it states that

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). As Judge Sessions explained in *Ozturk*, constitutional questions relating to detention do not "aris[e] from" removal proceedings simply because the detention occurs during

19

the removal proceedings. *See Ozturk*, Doc. # 104, slip op. at 37-39. The First Circuit, as well, has held that despite § 1252(b)(9), "district courts retain jurisdiction over challenges to the legality of detention in the immigration context."[14] This is an example of the general rule that "[w]hen a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." *E.O.H.C. v. Secretary U.S. Dep't of Homeland Sec'y*, 950 F.3d 177, 180 (3d Cir. 2020). A court of appeals cannot meaningfully provide, on petition for review of a final order of removal, review of whether someone should have been detained during removal proceedings, both because there may never be a removal order, and because if there is, the court of appeals cannot travel back in time and order that the person not be detained during the proceedings. *See id.* at 186.

Nor does 8 U.S.C. § 1252(g) pose a jurisdictional problem here. That section generally denies courts, outside of the petition for review process, "jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). As the Supreme Court has clarified, however, section 1252(g) is not "a sort of 'zipper' clause" but rather "applies only to three discrete actions that the Attorney General may take: her "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) ("*AADC*"). Mr. Mahdawi does not challenge, in this litigation, the government's decision to commence or adjudicate the proceedings against him, which the government could have done without detaining him; rather, he challenges the government's decision to detain him in violation

---

[14] *Aguilar v. U.S. Imm.& Customs Enforcement Div. of Dep't of Homeland Sec'y*, 510 F.3d 1, 11 (1st Cir. 2007). The legislative history of the REAL ID Act of 2005, which amended § 1252(b)(9), so states. *See Aguilar*, 510 F.3d at 11; H.R.Rep. No. 109–72, *available at* https://www.congress.gov/congressional-report/109th-congress/house-report/72/1, at 175 (amendment "would not preclude habeas review over challenges to detention that are independent of challenges to removal orders").

of the Constitution. He is not challenging the execution of a removal order against him, since no such removal order exists. As Mr. Mahdawi is not challenging any of the "three discrete actions" implicated by § 1252(g), *AADC*, 525 U.S. at 482, that section plays no role.

Finally, we note that, if any provision of the INA did purport to preclude this Court from ordering the release of a lawful permanent resident detained on account of protected speech in violation of his right to due process of law, it would be—in a word—unconstitutional. This is not a case involving the rule that "Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings," *Reno v. Flores*, 507 U.S. 292, 296 (1993), because no one suggests that Mr. Mahdawi has entered the country illegally.  He is a lawful permanent resident. He is being subjected to removal proceedings not based on any criminal conviction,[15] but  solely based on the Secretary of State's arbitrary assessment of adverse foreign policy consequences, and that assessment in turn is based on activities protected by the First Amendment. Under those circumstances, the Suspension Clause of the United States Constitution protects Mr. Mahdawi's right to habeas review of his detention, and none of the relevant INA provisions purport to be a suspension of the writ.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. Art. I, Sec. 9, Cl. 2.  Its protection extends to noncitizens without formal immigration status even when detained in Guantanamo Bay. *Boumediene v. Bush*, 553 U.S. 723 (2008). Surely its protection extends to Mr. Mahdawi, a lawful permanent resident detained in Vermont.  Mr. Mahdawi seeks (among other relief) simple release from custody.

The possibility of a petition for review at the conclusion of removal proceedings is not "an

---

[15] *Cf. Demore v. Kim*, 538 U.S. 510, 522-531 (2003) (upholding mandatory detention of deportable "criminal aliens" for "the limited period necessary for their removal proceedings").

adequate substitute for habeas corpus," *Boumediene*, 553 U.S. at 771, with respect to the question of detention during these removal proceedings (whether or not it would also be inadequate in other contexts), since it would occur only in the event of a final removal order and only after that detention had already taken place.. *Cf. E.O.H.C.*, 950 F.3d at 186 (engaging in similar analysis as a matter of statutory interpretation). Thus, the Suspension Clause would not allow Mr. Mahdawi to be denied habeas review, and told instead to await review by a Court of Appeals of his detention on petition for review of a final removal order.

The Suspension Clause and the First Amendment would not allow Congress to prescribe the detention of lawful residents for their protected speech and eliminate judicial review of that detention. If the INA were construed to attempt to do so—which, for the reasons discussed above, it should not be—it would be unconstitutional. Thus, on both statutory and Constitutional bases, the Court has authority to order Mr. Mahdawi's release. That this is only a request for interim release, not a final ruling, changes nothing. No "specific statutory provisions," *Mapp*, 241 F.3d at 229, bar interim release here. The real question is who should bear the risk if the Court's first judgment on jurisdiction or the merits proves wrong. Where there is no flight risk or danger, that burden should fall on the government—not on Mr. Mahdawi, a lawful permanent resident jailed for his protected speech.

## <u>CONCLUSION</u>

For these reasons, the Court should grant this motion and order Mr. Mahdawi's immediate release. Release will end the extraordinary harms of his detention, restore the status quo, and ensure that habeas relief remains meaningful by allowing full and fair consideration of the serious constitutional issues at stake.

Dated: April 21, 2025                          Respectfully submitted,
      Barre, Vermont

_____
Andrew B. Delaney
MARTIN  DELANEY  &  RICCI  LAW
GROUP
100 North Main Street
Barre, Vermont 05641
andrew@mdrvt.com
P: 802-479-0568

Luna Droubi*
Matthew Melewski**
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: (212) 277-5875
F: (212) 277-5880

Cyrus D. Mehta*
David A. Isaacson
CYRUS D. MEHTA & PARTNERS PLLC
One Battery Park Plaza, 9th Floor
New York, New York 10004
P: 212-425-0555
F: 212-425-3282

**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**
Ramzi Kassem***
Naz Ahmad***
Mudassar Hayat Toppa***
Shezza Abboushi Dallal***
CUNY School of Law
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel.: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu

23

*Attorneys for Petitioner*

*Pro Hac Vice

**Pro Hac Vice application pending

***Pro Hac Vice application forthcoming