UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MOHSEN MAHDAWI<br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP; *et al.,*<br>Respondents. | )<br>)<br>)<br>)<br>)   No. 25-cv-389<br>)<br>)<br>) |

**OPPOSITION TO MOTION FOR RELEASE UNDER *MAPP V. RENO*__**

The Court should deny Petitioner Mohsen Mahdawi's Motion for Release Under *Mapp v. Reno*, ECF No. 19, for several reasons. First, the Court is barred from exercising habeas jurisdiction pursuant to several provisions of the Immigration and Nationality Act ("INA"); it therefore lacks inherent authority to release Petitioner under *Mapp.* Second, even if the Court were to assert habeas jurisdiction, the Second Circuit's opinion in *Mapp* makes clear that any associated authority to release Petitioner pending resolution of the habeas case is subject to limitations imposed by Congress. Here, there are several such limitations, including Congress's express grant of authority to the Executive Branch to determine whether an alien's continued presence in the United States is contrary to foreign policy, and whether such an alien should be detained until he is removed for that reason. The Executive has made that determination with respect to Petitioner, and courts are ill suited to intervene in matters of foreign policy. Third, a review of Petitioner's history and characteristics, including review of pertinent law enforcement records, indicate that he has failed to make the showing necessary to justify release under *Mapp.*

**FACTUAL BACKGROUND**

On March 15, 2025, Secretary of State Marco Rubio issued a memorandum informing the Secretary of Homeland Security that "I have determined that Mohsen MAHDAWI . . . a U.S. Lawful Permanent Resident (LPR), is a deportable alien under [8 U.S.C. § 1227(a)(4)(C)]." *See*

1

Exhibit A, filed herewith. The memorandum recognized that under § 1227(a)(4)(C)(i)&(ii), "for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statement or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest." *Id.* Secretary Rubio further stated, "I have determined that the activities and presence of this alien in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." Referencing Mahdawi's role in leading protests at Columbia University, Secretary Rubio explained that he had determined "[t]he activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." *Id.* The memorandum further noted that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *Id.*

Following this determination, on April 14, 2025, Mahdawi was taken into custody by the Department of Homeland Security and served with a Notice to Appear ("NTA") in removal proceedings under the Immigration and Nationality Act ("INA"). The NTA alleged that Petitioner is removable because "[t]he Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would compromise compelling U.S. foreign policy interest." The NTA further alleges that Petitioner is subject to removal pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), "in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

While he was in custody in Vermont, Petitioner filed a Petition for Writ of Habeas Corpus

in this Court. ECF No. 1 ("Petition"), challenging the legality of his "detention and attempted removal." *Id.*, ¶ 1.

Prior to the April 21 status conference, the government submitted a Prehearing Memorandum (ECF No. 25), which explained why the Court lacks jurisdiction to consider the Petition. *Id.* at 3-16. The submission also articulated legal objections to Petitioner's request for release under *Mapp v. Reno. Id.* at 16-21. The Court converted ECF No. 25 to a motion to dismiss (with the government's consent), and invited the government to file this Opposition to Petitioner's Motion for Release Under *Mapp v. Reno*, ECF No 19, by noon Monday, April 28.

## ARGUMENT

### A. The Court Lacks Habeas Jurisdiction and Therefore *Mapp* Is Inapplicable.

As explained in Respondents' Prehearing Memorandum ECF No. 25, at 3-16, the Court lacks habeas jurisdiction because, as the Petition makes clear, it is a challenge to the initiation of removal proceedings against Petitioner, Petitioner's detention is undisputably connected to those proceedings, and under *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ("*AADC*"), and *Ragbir v. Homan,* 923 F.3d 53, 64 (2d Cir. 2019), Petitioner cannot circumvent § 1252(g)'s jurisdiction-stripping effect by alleging that the challenged decisions were "made based on unlawful considerations." Furthermore, under well-settled precedent, the detention of an alien during removal proceedings is "a constitutionally valid aspect of the deportation process." *Demore v. Kim,* 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores,* 507 U.S. 292, 306 (1993)).

The Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), recognizing that federal courts have "inherent authority to admit habeas petitioners to bail in the immigration context" was limited to "case[s] where they may properly assert jurisdiction[.]" *Id.* at 223, 225. As previously demonstrated, this Court does not have jurisdiction. Accordingly, *Mapp* does not permit the Court to consider the question of Petitioner's release.

Moreover, the Second Circuit also recognized in *Mapp* that a court's inherent authority to consider bail for habeas petitioners, "may well be subject to appropriate limits imposed by Congress," and that "Congress has not, to date, curtailed this feature of federal judicial power." 241 F.3d at 223. As previously argued, ECF No. 25, at 16-21, Congress has since legislated to further insulate immigration detention from habeas review. *See* 8 U.S.C. §§ 1226(e) & 1252(a)(2)(B)(ii).

**B. If the Court (1) Asserts Habeas Jurisdiction and (2) Concludes *Mapp* Relief is Not Foreclosed by Limits Imposed by Congress, Petitioner Still Cannot Meet the Difficult Standard *Mapp* Requires.**

The Second Circuit is clear: "the standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp,* 241 F.3d at 226 (quoting *Grune v. Coughlin,* 913 F.2d 41, 43-44 (2d Cir. 1990)); *see also id.* at n.5 (canvassing standards for habeas bail from other courts, including a showing of "a high probability of success"). To ensure any release on bail is also in the public interest, courts must also assess whether Petitioner has established that he does not present a threat or a risk of nonappearance. *Mapp*, 241 F.3d at 231 n.14.

                **1. Petitioner Has Not Presented a Substantial Claim.**

Congress entrusted the Executive Branch with weighing the nation's foreign policy interests against the First Amendment protections afforded to non-citizens. The record in this case demonstrates that the Secretary of State has made that assessment. In Exhibit A, filed herewith, the Secretary specifically concluded not only that Petitioner's presence would have potentially serious adverse foreign policy consequences, *see* 8 U.S.C. § 1227(a)(4)(C)(i), but also that Petitioner's presence would compromise a compelling United States foreign policy interest, 8 U.S.C. §§ 1182(a)(3)(C)(iii) & 1227(a)(4)(C)(ii).

There is thus no doubt that Petitioner's removal is statutorily authorized. Again, an alien may be removed—including for his "beliefs, statements, and associations"—so long as "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest. 8 U.S.C. §§ 1182(a)(3)(C)(iii) & 1227(a)(4)(C)(ii); *see also* 8 U.S.C. § 1182(a)(3)(B)(i). Importantly, Petitioner does not argue these statutory provisions are themselves unconstitutional. Nor could he. The Supreme Court has affirmed that the Executive Branch may base removal actions on an alien's political activity. *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952); *see also, e.g.*, *Turner v. Williams*, 194 U.S. 279, 293 (1904). This is one of the specific "areas" where "aliens' First Amendment rights" are "less robust than those of citizens." *Bluman v. Fed. Election Comm'n,* 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (citing *Harisiades,* 342 U.S. at 591–92), aff'd, 565 U.S. 1104 (2012).

Petitioner still challenges his removal on constitutional grounds, however, reasoning it is, essentially, the product of unlawful ideological targeting. ECF No. 19, at 9-11. But that argument should be rejected.

*First*, the Supreme Court has already held that "selective enforcement" claims are broadly unavailable to aliens in the immigration context. In *AADC,* for example, the Court noted the government's admission "that the alleged First Amendment activity was the basis for selecting the individuals for adverse action." 525 U.S. at 488 n.10. The aliens brought a First Amendment challenge and argued to the Supreme Court that a lack of immediate review would have a "chilling effect" on their First Amendment rights. *Id.* at 488. Nonetheless, the Supreme Court held that under the system for review Congress created, and under our constitutional structure, such a selective enforcement claim was not available. *Id.* at 490-91. That is this case; *AADC* is dispositive.

5

*Second*, there is no constitutional bar to the Executive Branch prioritizing certain political activity in the context of exercising otherwise lawful removal authorities. Indeed, in *Harisiades*, the Government sought to remove certain aliens for being members of the Communist Party—*because* they were members of the Communist Party (or at least were at one point). 342 U.S. at 581. There is no constitutional difference between immigration enforcement prioritized toward communists, and that prioritized towards supporters or sympathizers of other causes.

*Third*, Secretary of State Rubio's foreign-policy determination is not reviewable under the First Amendment. The Supreme Court has recognized that administering the nation's foreign policy is the province of the Executive Branch, especially in the context of immigration enforcement. "The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity *and utterly unable to assess their adequacy.*" *AADC,* 525 U.S. at 491 (emphasis added). Especially so where, as here, such a decision has been expressly assigned to the discretion of the Executive Branch via federal statute. In those cases, the Secretary's determination is conclusive and unreviewable by the federal courts. *See Zivtofsky v. Clinton,* 566 U.S. 189, 194-95 (2012) ("a controversy 'involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it.'") (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993); *see also Haig v. Agee,* 453 U.S. at 282, 289, 309; ECF No. 25, at 14-16. Moreover, even if this rule were subject to some exception, Petitioner has not established why one is warranted here. The Secretary of State's determination enjoys a presumption in favor of regularity that Petitioner has not displaced. *See United States v. Armstrong,* 517 U.S. 456, 464 (1996) ("presumption of regularity" applies to prosecutorial

6

decisions); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971). Indeed, Petitioner has received the "statutory citation" for his removal, which constitutes the outer bounds of process that he is entitled to here. *Trump v. Hawaii*, 585 U.S. 667, 703-04 (2018) ("respect for the political branches' broad power over the creation and administration of the immigration system meant that the Government need provide only a statutory citation to explain a visa denial") (discussing and quoting *Kerry v. Din,* 576 U.S. 86, 105 (2015) (Kennedy, J., concurring)). There is no constitutional basis to probe beyond that submission, let alone set it aside.

Thus, Petitioner has not shown a clear case for habeas relief or extraordinary circumstances. The Government has lawful basis for seeking removal and has implemented the process established by Congress for balancing the First Amendment rights of Petitioner against the foreign policy interests of the nation. Having engaged in that congressionally approved balancing, the Court may not second-guess the Executive's determinations that Petitioner's presence in the country is contrary to foreign policy. That determination also compels against reversing the Executive's discretionary decision to detain Petitioner during the duration of his removal proceedings.

### 2. Petitioner's Release Would Not Be in the Public Interest.

#### a. Releasing Petitioner Would Take Over the Executive's Policy Determination.

*Mapp* relief can only occur if the Petitioner can also establish it is in the public interest. Because the Secretary of State has determined Petitioner's presence in the United States is contrary to foreign policy, a decision to release Petitioner under *Mapp* would necessarily require the Court to second-guess and reject that very determination which Congress has personally entrusted to the Secretary of State. As touched on above, that is not the role of this Court. *See AADC*, 525 U.S. at 491.

### b. Petitioner Cannot Establish He Does Not Present a Danger or a Risk of Non-Appearance.

But even if this Court were to second-guess the decision of the Secretary of State, it should come to the same conclusion. There is ample evidence—all of which, again, should go to the immigration judge and be evaluated during those exclusive proceedings—to indicate that Petitioner is a threat to the community, and thus ineligible for *Mapp* relief. *See Mapp*, 241 F.3d at 231 n.14.

The government acknowledges Petitioner has not been convicted of criminal offenses. However, law enforcement records and Petitioner's submissions indicate he (1) has admitted to being involved in and supporting antisemitic acts of violence; (2) has admitted to an interest in and facility with firearms for that purpose; and (3) has access to unexplained sources of wealth that he has used to purchase real estate, travel internationally, and acquire illegal drugs. These circumstances all militate against release.

Petitioner arrived in the United States in July 2014. *See* ECF No. 19-4, at 4. According to Windsor, Vermont, police reports (filed herewith as Exhibit B), by 2015, he had moved to the Upper Valley, where he initially lived with his wife. In August 2015, Windsor Police spoke with a local gun shop owner, who reported that earlier that summer Petitioner offered to work in the gun shop without monetary compensation. According to the report, Petitioner "supposedly told" the gun shop owner "that he had considerable firearm experience and used to build modified 9mm submachine guns to kill Jews while he was in Palistine [sic]." *Id.* at 2. On another occasion that summer, Petitioner told the gun shop owner that "he wished to purchase a sniper rifle and a machine gun." *Id.* at 3. On this occasion, Petitioner did not specify the exact gun he wanted, and he did not share his purpose in wanting to purchase the weapons. *Id.* The gun shop owner referred

8

the police to another member of the community, who also recounted that Petitioner stated in 2015 that "I like to kill Jews." *Id.* at 4.

Windsor Police reports also show that by November 2015, Petitioner was in the process of divorcing from his wife, who asked the police department to take custody of a shotgun in their home following a "non-physical argument" with him. *Id.* at 6. The divorce became final in June 2016. *See* ECF No. 19-4, at 4.

Notably, none of the many letters of support submitted on Petitioner's behalf, (ECF No. 19-1), address Petitioner's actions or words from the summer of 2015. Rather, the earliest experience with Petitioner recounted appears to be from a supporter who met him in December 2015, after Petitioner's wife reported to the police that they were divorcing. *See* ECF No. 19-1, at 165[1]; Exhibit B, hereto, at 6. Petitioner moved in with this supporter in January 2016, and they have remained close. *Id.* According to this supporter, when Petitioner moved in with him Petitioner was taking classes at Dartmouth and trying to find employment. This supporter offered Petitioner a job at a general store, where Petitioner appeared to work part-time while attending classes at Dartmouth. ECF No. at 165; *see also id.* at 177.

In addition to attending Dartmouth, Petitioner also attended Lehigh University from 2018 until 2021, when he transferred to Columbia, ECF No. 19-2. At Columbia he remains 13 credits away from obtaining a bachelor's degree. ECF No. 19-1, at 202.

At some point in or after 2018 Petitioner also purchased "a beautiful hilltop piece of land in West Fairlee, VT." ECF 19-1, at 159. He has also repeatedly travelled internationally. *See* CBP Report of January 2019 Encounter with Petitioner at Derby Line Port of Entry, Exhibit C, filed herewith, at 4 (Petitioner reporting he was returning from two days in Montreal to visit a woman

---

[1] Another supporter recalled hearing Petitioner speak in 2015. ECF No. 19-1, at 198.

he had met on a recent Caribbean cruise). According to Exhibit C, when he was returning from Canada in January 2019 at Derby Line, petitioner also illegally possessed LSD, methamphetamine, and illegal mushrooms. *Id.* at 4. He also possessed more than $4,000 in U.S. currency. *Id.* at 4.

When deciding to release or detain someone under the Bail Reform Act, the Court customarily has the benefit of a pre-trial services report, prepared by a neutral member of the probation office. The court does not have the benefit of such a report here. But in light of the disturbing admissions attributed to him by members of the Windsor, Vermont, community in 2015, the absence of any information about that time among Petitioner's voluminous submission should give the Court pause. And, despite having attended college classes since 2016, Petitioner has not yet earned a degree. He also appears to have unexplained access to substantial financial resources, which he used to purchased real estate, travel internationally, and acquire illegal controlled substances. He also expressed interest in purchasing a sniper rifle and a machine gun. Given this information, the Court should be especially reluctant to disturb the Secretary of State's determination that Petitioner's presence is contrary to the foreign policy of the United States.

Petitioner has failed to meet his burden to establish that he does not present a danger or risk of non-appearance.

## CONCLUSION AND REQUEST FOR STAY

For the above reasons, not only does this Court lack jurisdiction to release Petitioner under *Mapp v. Reno,* Petitioner has also failed to make the showing necessary for such release.

If the Court rejects the arguments contained herein and does order Petitioner's release pending the outcome of this matter, the government respectfully requests that the Court stay the order for seven days in order to allow the government to pursue an appeal.

                                                              Respectfully submitted,

Dated: April 28, 2025                      By:    */s/ Michael P. Drescher*
                                                                      Michael P. Drescher
                                                                        Assistant United States Attorney
                                                                        District of Vermont